66 Cal.Rptr.3d 228 (2007)
155 Cal.App.4th 604
The PEOPLE, Plaintiff and Respondent,
v.
Anna AYALA, Defendant and Appellant.
No. H030471.
Court of Appeal of California, Sixth District.
September 21, 2007.
*230 Robert Derham (Under appointment by the Court of Appeal), San Anselmo, for Defendant and Appellant.
Edmund G. Brown Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney *231 General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Nanette Winaker, Deputy Attorney General, for Plaintiff and Respondent.
*229 DUFFY, J.
Defendant Anna Ayala appeals from a judgment entered following her pleas of guilty to three felony counts, namely, presenting a false or fraudulent insurance claim (Pen.Code, § 550, subd. (a)(1); count l),[1] attempted grand theft of personal property over $400 (§§ 664/487, subd. (a); count 2), and grand theft of personal property over $400 (§§ 484-487, subd. (a); count 3). The facts underlying the convictions for counts 1 and 2 arose out of the reported discovery of a severed finger in a bowl of Wendy's chili that received national notoriety in 2005. (The grand theft conviction arose out of an unrelated scheme involving defendant's purported sale of a mobile home that she did not own.) Defendant also admitted the special allegation as to the first two counts that she "damaged or destroyed property" in an amount in excess of $2,500,000.00. (§ 12022.6, subd. (a)(4)).
The court sentenced defendant to an upper term of five years in prison on count 1, along with a four-year consecutive sentence for the property damage enhancement. Defendant received an 18-month sentence for the count 2 conviction, along with a four-year enhancement, but execution was stayed pursuant to section 654. The court sentenced defendant to a two-year concurrent term for the count 3 conviction. Defendant was also ordered to make restitution to Wendy's International Corporation (Wendy's), Jem Management (the entity that owned several Wendy's restaurants in Santa Clara County and Fresno; Jem), and Jem's employees.
Defendant presents three challenges on appeal. First, she claims that the order requiring her to pay $170,604.66 to 177 line employees and nine general managers of Jem was an unlawful restitution order under section 1202.4 because they were not direct victims of her crimes. Second, she asserts that sentencing under the property damage enhancement (§ 12022.6, subd. (a)(4)) was improper because the enhancement was based upon losses to Wendy's (lost profits and goodwill) that did not constitute "property damage" under the statute. Lastly, she contends that the court erred in imposing an upper term sentence of five years for count 1 in violation of her Sixth Amendment right to a jury trial and her Fourteenth Amendment right to due process. She claims that under Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (Blakely), and Cunningham v. California (2007) 549 U.S. ___, 127 S.Ct. 856, 166 L.Ed.2d 856 (Cunningham)), she was entitled to have a jury determine beyond a reasonable doubt any aggravating facts that were used to impose the upper term sentence.
We conclude that the Jem employees were direct victims of defendant's crimes and that the restitution order pursuant to section 1202.4 was therefore proper. Second, we hold that defendant is barred from challenging her sentence under section 12022.6 because of her failure to obtain a certificate of probable cause under section 1237.5. Finally we conclude, based upon Cunningham, that there was Blakely error that was not harmless beyond a reasonable doubt. We therefore reverse the judgment and remand for the limited purpose of resentencing in light of the holding in Cunningham.

*232 FACTS
Since defendant pleaded guilty to all charges, we present a summary of the evidence relevant to the challenges on appeal based principally upon information contained in the probation report:

I. Counts 1 and, 2

On December 20, 2004, a coworker of defendant's husband, Jaime Plascencia, severed the tip of his finger in a workrelated accident occurring in Nevada. In early 2005after the coworker returned to the job and showed the fingertip to his coworkersPlascencia bought the fingertip for $100.00. He told the coworker that "he was going to have his wife place the fingertip in some food."
On the evening of March 22, 2005, defendant and other family members (but not Plascencia) went to a Wendy's fast food restaurant on Monterey Road in San Jose. When she arrived, defendant asked if the restaurant served chili. Sometime later, she claimed that she had bitten into a finger in the chili that she had bought. Defendant "then walked throughout the restaurant with the finger on a napkin as she told customers, `Don't eat the chili[;] look what I found in mine.'"
After the incident, defendant's attorney contacted Wendy's. Defendant made various public statements about the incident, including television interviews. She was quoted in one such interview as saying, "`The thought of ... just knowing that there was a human remain in my mouth, it is disgusting. It is tearing me apart inside.'" She also denied planting the finger in her chili, saying, "`Where would I get a damn finger, for God's sake[?]'"
On April 12, 2005, there was a public announcement that Ayala was no longer seeking compensation from Wendy's. Plascencia later told his coworker that his wife had placed the finger in Wendy's chili and he offered the coworker $250,000.00 from Plascencia's and Ayala's lawsuit to keep his mouth shut.
It was determined through investigation that the condition of the finger "found" in Ayala's chili was inconsistent with it having been cooked in chili at 170 degrees for three hours, which was Wendy's method of preparing chili. Ultimately, it was determined that the source of the finger was Plascencia's coworker.
Wendy's claimed that it had incurred losses of $1,000,000.00 per day between March 22, 2005, and April 20, 2005, as a result of the hoax. The low sales occurring at the Wendy's restaurant on Monterey Road resulted in the reduction in hours of its employees. Wendy's also paid a reward of $100,000.00 for information concerning the source of the severed fingertip.

II. Count 3

In September 2002, Bertha Davila entered into a contract to purchase a mobile home from defendant at a price of $52,000.00. Davila paid $11,000.00 as a down payment and in October 2002, she moved into the mobile home with her family. The mobile home in fact belonged to Plascencia.
Defendant took Davila to a real estate office to file the necessary papers. The agent said that Davila could not qualify for the purchase because she lacked a credit history or Social Security number. Defendant, acting as translator, did not communicate the agent's statement to Davila. In a final attempt to qualify Davila for the purchase, defendant offered the agent $500.00, which the agent declined. The agent instead gave defendant papers for a "`for sale by owner transaction.'" Davila completed the forms and gave them to *233 defendant, who agreed to return them to the agent.
Davila assumed that the transaction was concluded, but approximately three weeks after she moved in, she received a notice from a bank telling her that she had three days to vacate the mobile home because Plascencia, the owner, had defaulted on his loan. In November 2003, Davila went to Las Vegas and asked defendant for her money back. Defendant told Davila that she didn't know what she was talking about and refused to discuss the matter with her. As a result of this incident, Davila lost her entire savings, plus additional money that she had borrowed to tender the down payment to defendant.

PROCEDURAL BACKGROUND
Defendant was charged by second amended complaint with presenting a false or fraudulent insurance claim (§ 550, subd. (a)(1); count 1), attempted grand theft of personal property over $400 (§§ 664/487, subd. (a); count 2), and grand theft of personal property over $400 (§§ 484-87, subd. (a); count 3).[2] The complaint contained a special allegation that, as to counts 1 and 2, defendant damaged and destroyed property of a value exceeding $2,500,000.00 within the meaning of section 12022.6, subdivision (a)(4).
On September 9, 2005, defendant entered an unconditional plea of guilty to all three counts and admitted the enhancements. On January 18, 2006, defendant received an upper term sentence of five years in prison for the count 1 conviction, plus an additional four years for the property damage enhancement under section 12022.6, subdivision (a)(4). She also received an 18-month sentence for the count 2 conviction plus a four-year enhancement under section 12022.6, subdivision (a)(4); the sentence on count 2 was stayed pursuant to section 654. The court imposed a two-year, concurrent sentence for the count 3 conviction. In addition, the court ordered that defendant pay restitution to Wendy's ($21,254,307.00), to Jem ($493,343.00), and to Jem employees ($177,604.46). The court ordered further that, as to count 3, defendant pay restitution to Davila in the sum of $18,920.00.
Defendant did not file a timely appeal from the judgment. In August 2006, defendant filed an application for relief from default, asserting that she had mistakenly believed that her trial counsel would file a timely appeal. This court granted the application, and defendant filed a notice of appeal from the judgment on September 27, 2006. The notice of appeal was not accompanied by a certificate of probable cause, but contained a recital that it was "based upon the grounds that the court committed sentencing error. This ground arose after entry of a guilty plea and does not challenge the validity of the plea." (See pt. Ill of Discussion, post.)

DISCUSSION

I. Contentions on Appeal

Defendant asserts three challenges to the judgment:
1. The restitution order requiring defendant to pay $170,604.66 to the Jem employees was unlawful because the employees *234 were not "victims" within the meaning of section 1202.4.
2. The four-year sentence under the property damage enhancement (§ 12022.6, subd. (a)(4)) cannot stand because the enhancement was based upon losses to Wendy's (lost profits and goodwill) that did not constitute "property damage" under the statute.
3. The court imposed an upper term sentence for the count 1 conviction that was based upon aggravating circumstances that were not part, of a jury's factual findings. Under Blakely, supra, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, and Cunningham, supra, 549 U.S. ___, 127 S.Ct. 856, this sentence violated defendant's right to a jury trial guaranteed under the United States and California Constitutions.
We discuss these claims of error, post.

II. The Restitution Order to Jem Employees

Defendant contends that the court had no discretion to order her to make restitution under section 1202.4 to the Jem employees. She argues that the employees were not "victims" within the meaning of the statute because it was Wendy's that was the object of her crimes. Accordingly, defendant claims that the restitution order to the Jem employees must be stricken.
The Attorney General responds that defendant forfeited this appellate challenge by failing to object below. He argues that defendant's contention is in any event without merit.

A. Forfeiture

A criminal defendant, by failing to object at the trial level, forfeits his or her appellate "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (People v. Scott (1994) 9 Cal.4th 331, 353, 36 Cal. Rptr.2d 627, 885 P.2d 1040 (Scott).) But there is an exception to this forfeiture principle. A defendant who fails to object at the trial level is not precluded from challenging an unauthorized sentence, namely, a sentence that "could not lawfully be imposed under any circumstance in the particular case." (Id. at p. 354, 36 Cal. Rptr.2d 627, 885 P.2d 1040; see also People v. Welch (1993) 5 Cal.4th 228, 235, 19 Cal.Rptr.2d 520, 851 P.2d 802 [exceptions to forfeiture doctrine "generally involve pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court"].) In sum, forfeited challenges are those that "involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner." (Scott, supra, at p. 354, 36 Cal.Rptr.2d 627, 885 P.2d 1040.)
The Supreme Court has recently clarified the forfeiture doctrine and the rationales for exceptions to the general rule that the failure to object at trial to an erroneous ruling forfeits that party's right to raise the claim on appeal. (See In re Sheena K. (2007) 40 Cal.4th 875, 55 Cal. Rptr.3d 716, 153 P.3d 282.) In the context of reviewing sentencing matters, the "socalled `unauthorized sentence' [forfeiture exception applies where the sentence] ... [citations] ... cannot `lawfully be imposed under any circumstance in the particular case' (Scott, supra, 9 Cal.4th at p. 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040]).... An obvious legal error at sentencing that is `correctable without referring to factual *235 findings in the record or remanding for further findings' is not subject to forfeiture. [Citations.]" (Id. at p. 887, 55 Cal. Rptr.3d 716, 153 P.3d 282, quoting People v. Smith (2001) 24 Cal.4th 849, 852, 102 Cal.Rptr.2d 731, 14 P.3d 942.) In the context of a challenge to probation conditions, the court concluded in In re Sheena K. that, while the failure to object to unreasonable probation conditions forfeited such appellate challenges (People v. Welch, supra, 5 Cal.4th at pp. 234-238, 19 Cal. Rptr.2d 520, 851 P.2d 802), a defendant's claim that probation conditions were unconstitutionally vague and overly broad is not barred due to the failure to object at the trial court. (In re Sheena K., supra, at p. 889, 55 Cal.Rptr.3d 716, 153 P.3d 282; see also id. at p. 887, 55 Cal.Rptr.3d 716, 153 P.3d 282: "[A] challenge to a term of probation on the ground of unconstitutional vagueness or overbreadth that is capable of correction without reference to the particular sentencing record developed in the trial court can be said to present a pure question of law.")
This exception to the forfeiture doctrine has been applied in the context of purely legal challenges to the imposition of restitution fines. For instance, in People v. Chambers (1998) 65 Cal.App.4th 819, 823, 76 Cal.Rptr.2d 732, the court held that a defendant's challenge to the imposition of a second restitution fine following the trial court's revocation of probation was not forfeited because the trial court acted in excess of its authority by imposing the second fine. (See also People v. Kunitz (2004) 122 Cal.App.4th 652, 657, 18 Cal. Rptr.3d 843; People v. Blackburn (1999) 72 Cal.App.4th 1520, 1534, 86 Cal.Rptr.2d 134.)
Here, defendant asserts that the sentencenamely, the order that she make restitution to Jem employees under section 1202.4was unauthorized under any circumstance because the Jem employees were not direct victims of a crime as a matter of law. Defendant's challenge is a purely legal one, namely, that the fine was unlawful because under no circumstances were the Jem employees among the class of victims to which the restitution statute was made applicable. The sentenceaccording to defendantwas thus one that "could not lawfully be imposed under any circumstance in the particular case." (Scott, supra, 9 Cal.4th at p. 354, 36 Cal. Rptr.2d 627, 885 P.2d 1040.) Accordingly, since the claim here is that the sentence was unauthorized by law, defendant may challenge it for the first time on appeal. (Ibid.)
We next address the merits of defendant's claim. Since her challenge to the restitution order to the Jem employees "is a legal issue of statutory construction, ... we review [it] under an independent or de novo standard. [Citation.]" (People v. Saint-Amans (2005) 131 Cal.App.4th 1076, 1084, 32 Cal.Rptr.3d 518.)

B. Merits of Challenge to Restitution Order

1. Victim restitution laivs

The source of section 1202.4 is the state electorate's enactment in 1982 of Proposition 8, which added article I, section 28 to the California Constitution. Mandatory restitution to all crime victims was adopted under that constitutional provision: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for the losses they suffer. [¶] Restitution shall be ordered ... in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary." (Cal. Const., art. I, *236 § 28, subd. (b).) The electorate required the Legislature to adopt laws to implement victim restitution within the calendar year after Proposition 8's enactment. (Ibid.) As a result of Proposition 8, "[t]he Legislature has enacted, and frequently amended, a bewildering array of responsive statutes." (People v. Birkett (1999) 21 Cal.4th 226, 228, 87 Cal.Rptr.2d 205, 980 P.2d 912 (Birkett).)
Section 1202.4, subdivision (a)(1) provides that "[i]t is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." Subdivision (f) of the statute provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." The order must provide for full restitution, unless there are "compelling and extraordinary reasons for not doing so, and [the court] states them on the record." (Ibid.) And the restitution order "shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct ...." (§ 1202.4, subd.(f)(3).)
Section 1202.4 contains a definition of "victim" that is not all-inclusive.[3] Under subdivision (k) of that statute, a "victim" who is entitled to restitution "includes" surviving family members "of the actual victim"; any entity that "is a direct victim of a crime"; a "person who has sustained economic loss as the result of a crime and" is either a victim's close relative, a member of the victim's household when the crime occurred, a relative and former member of the victim's household for at least two years, "another family member of the victim ... who witnessed the crime," or a minor victim's primary caretaker; or a person entitled to aid from the Restitution *237 Fund as provided in Government Code section 13950 et seq. (Italics added.)

2. Whether Jem employees were direct victims under section 12024

Despite the clear mandate of the electorate in Proposition 8 to provide restitution to "all crime victims" (Cal. Const., art. I, § 28, subd. (b), 1st par.), defendant here contends that the Jem employees who lost significant wages because of the "finger-in-the-chili" hoax were not victims entitled to restitution under section 1202.4. She cites Birkett, supra, 21 Cal.4th 226, 87 Cal. Rptr.2d 205, 980 P.2d 912, in support of her position. We conclude below that defendant's claim lacks merit.
In Birkett, the trial court ordered that the defendantwho pleaded guilty to auto theft and running a "chop shop" and received probationpay restitution to two automobile insurers that had reimbursed insureds whose vehicles had been stolen. (Birkett, supra, 21 Cal.4th at pp. 229-230, 87 Cal.Rptr.2d 205, 980 P.2d 912.) The trial court determined that the insurers were entitled to victim restitution under former section 1203.04, which had required that courts order victim restitution when placing defendants convicted of crimes on probation. (Birkett, supra, at p. 230, 87 Cal.Rptr.2d 205, 980 P.2d 912.)[4] The Supreme Court concluded that the clear language of the statute precluded victim restitution from adult probationers to insurers providing reimbursement to their insureds as a result of losses the latter sustained as a result of criminal activity; it held that the companies were not direct victims of the charged crimes. (Birkett, supra, at p. 234, 87 Cal.Rptr.2d 205, 980 P.2d 912.) It held further that, after extended analysis of the legislative history of the victim restitution statutes (including mandatory restitution in nonprobationary cases), the statute did not provide for restitution to insurers, because they did not become direct victims by virtue of making payments to their insureds for crime-related losses. (Id. at pp. 234-245, 87 Cal.Rptr.2d 205, 980 P.2d 912.)
Birkett involved very different facts and does not compel the conclusion here that the Jem employees were not direct victims entitled to restitution under section 1202.4. In Birkett, the court considered whether an insurer, by reimbursing its insureds for losses they incurred as a result of the defendant's crimes, thereby became a direct victim by stepping into the shoes of those harmed by the defendant's conduct. It held that "by its plain terms, the 1994 mandatory restitution scheme excluded reimbursing insurers, claiming in that capacity, as `direct victim[s]' entitled to restitution from an adult probationer." (Birkett, supra, 21 Cal.4th at p. 234, 87 Cal.Rptr.2d 205, 980 P.2d 912.) In this instance, the Jem employees obviously did not pay money to Wendy's or Jem, the entities that defendant claims are the only "direct victim[s]" entitled to restitution under section 1202.4. Thus, while Birkett would bar victim restitution to insurers reimbursing Wendy's or Jem for its losses, it presents no impediment to restitution in this instance.
But defendant contends that under Birkett, restitution is limited to one who is the "`"object of a crime...."' [Citation.]" (Birkett, supra, 21 Cal.4th at p. 232, 87 *238 Cal.Rptr.2d 205, 980 P.2d 912, quoting People v. Crow (1993) 6 Cal.4th 952, 957, 26 Cal.Rptr.2d 1, 864 P.2d 80.) She claims that the Jem employees were neither the objects of her crimes nor the direct victims of them. She argues that Wendy's, not Jem's employees, was the target of her offenses of presenting a false claim and attempted grand theft and that the court was therefore without jurisdiction to impose a restitution order in favor of the employees. We reject this argument.
Defendant's position suggests that one harmed by criminal action may receive restitution under section 1202.4 only if the actor intended to harm or directed his or her actions toward the harmed person or entity. No such requirement exists for victim restitution. As noted, the Constitution identifies "... the unequivocal intention of the People of the State of California [as being] that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer." (Cal. Const., art. I, § 28, subd. (b), 1st par., italics, added.) And section 1202.4, subdivision (a)(1) provides that "[i]t is the intent of the Legislature that a victim of a crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." Neither the Constitution nor the statute purports to limit the class of victims injured by criminal conduct for whom restitution is intended to those who were targets of the subject crime. To the contrary, the phrase, "as a result of found in both the Constitutional provision and the statute is broad enough to include both the target(s) of a defendant's crime and those unintentionallybut directlyharmed by it.
As noted by the Second District Court of Appeal, "our Supreme Court has given the term `victim' [in restitution statutes] a broad and flexible meaning. [Citations.]" (People v. Ortiz (1997) 53 Cal.App.4th 791, 797, 62 Cal.Rptr.2d 66.) Thus, in People v. Broussard (1993) 5 Cal.4th 1067, 1075, 22 Cal.Rptr.2d 278, 856 P.2d 1134, the court construed former Government Code section 13967, subdivision (c) as requiring victim restitution by nonprobationary offenders to include anyone suffering economic loss, regardless of whether the "victim" sustained physical injury. Further, in People v. Crow, supra, 6 Cal.4th at page 960, 26 Cal.Rptr.2d 1, 864 P.2d 80, the court held that under the same statute that restitution was not limited to victims who were natural persons, concluding that a government agency could receive restitution from a defendant convicted of welfare fraud. (See also People v. Beck (1993) 17 Cal.App.4th 209, 220-223, 21 Cal.Rptr.2d 250 [upholding validity of restitution order to Franchise Tax Board under former Government Code section 13967, subd.(c)].) Nothing in Birkett changed the broad meaning afforded to the term "victim" under the restitution statutes.
Thus, for example, in People v. Ortiz, supra, 53 Cal.App.4th at pages 795, 62 Cal.Rptr.2d 66 to 797, the court upheld a restitution order under section 1202.4 in favor of a nonprofit trade association comprised of Latin American music labels formed to combat counterfeiting, notwithstanding the defendant's challenge that his offense of possessing over 50 thousand counterfeit cassette tapes was a crime against the individual record labels, not the association. Likewise, in People v. O'Neal (2004) 122 Cal.App.4th 817, 820-821, 19 Cal.Rptr.3d 202, the court broadly interpreted "victim" under section 1202.4 to include not only the child the defendant physically molested, but also the child's brother who suffered emotionally as a result of his sister's molestation. (See also People v. Moloy (2000) 84 Cal.App.4th 257, *239 260-261, 100 Cal.Rptr.2d 676 [distinguishing Birkett, insurance companies, as well as motorist-insureds involved in staged accidents, were direct victims of the defendant's conspiracy to present fraudulent claim].)
In this instance, while Wendy's no doubt was the target of defendant's unsuccessful scam, it is clear that the Jem employees lost wages as a result of defendant's criminal actions. A detailed summary was presented to the court that identifiedfor each of the 177 Jem employees and nine managersthe number of hours lost, the employee's hourly rate, and the amount of lost wages. The summary identified wage loss claims that ranged from less than one dollar to more than $6,100.00. Joseph Desmond, Jem's owner, stated to the trial court that the crew members at Jem's Wendy's restaurantswhom he considered "part of our family"were the ones upon whom defendant's conduct had had the greatest impact and who had suffered the most financially and emotionally. Hector Pinedaa 13-year employee of the Wendy's store on Monterey Road in San Jose who was responsible for preparing chilitold the court that he not only lost wages as a result of a reduction in working hours because of defendant's actions; he was also the subject of scorn and accusations from people whom he had previously thought were his friends. In addition, Jose Borrayothe cashier at the Monterey Road store who waited on defendantstated to the court that he had lost wages because his hours were cut back for several months after the incident and that he was forced to borrow money for rent and food. Borrayo described the embarrassment and humiliation he had suffered as a result of the incident: Defendant yelled at him in front of other customers "for selling a finger and asked [him] who [he] kill[ed] to get [a] finger. [He] had to go to the police and take a lie detector test."
Indeed, defendant does not argue that the employees did not sustain economic losses or that the lost wages were not the result of the "finger-in-the-chili" hoax. But because her actions were not directed toward the Jem employees, she contends that they were not "direct victims" entitled to restitution under section 1202.4. Implicit in this argument is the position that, because defendant intended to harm Wendy's, and not the individuals working at Wendy's restaurants, she is essentially blameless for the significant consequences of her actions upon Jem's managers and rank-and-file employees. We reject that conclusion.
We do not read the Supreme Court's construction of the victim restitution statutes as requiring that a victim be the "object" of the crime in the sense that the defendant's criminal conduct was specifically directed to that individual or entity. In addition to describing the "victim" as being one who is the object of a crime (Birkett, supra, 21 Cal.4th at p. 233, 87 Cal.Rptr.2d 205, 980 P.2d 912; People v. Crow, supra, 6 Cal.4th at p. 957, 26 Cal. Rptr.2d 1, 864 P.2d 80), the court has also stated that victims entitled to restitution are those who are "the real, actual, immediate, and direct victims of crime...." (Birkett, supra, at p. 243, 87 Cal.Rptr.2d 205, 980 P.2d 912.) In Birkett, the court defined "actual" as "`[e]xisting in ... fact; ... real, ...' [citation]" (id. at p. 233, fn. 5, 87 Cal.Rptr.2d 205, 980 P.2d 912); and "direct" as "`straightforward, uninterrupted, [or] immediate' in time, order or succession, or `proceeding [in logic] from antecedent to consequent, from cause to effect, etc., uninterrupted,' or generally `[e]ffected or existing without intermediation or intervening agency; immediate.' [Citation.]" *240 (Id. at p. 233, fn. 6, 87 Cal.Rptr.2d 205, 980 P.2d 912.) Applying these definitions, the Jem employees were unquestionably actual and direct victims of defendant's criminal conduct. They were undoubtedly "`real'" people who suffered as result of defendant's actions; their wage losses were a "`straightforward, uninterrupted, [or] immediate' " consequence of the abortive scam. And taken to its logical extreme, were victim restitution permitted only to victims against whom the defendant's conduct was directed, a police officer injured or killed in a high-speed chase would be a victim entitled to restitution under section 1202.4, while an innocent bystander injured or killed would not. (See generally People v. Sckmies (1996) 44 Cal.App.4th 38, 46-58, 51 Cal.Rptr.2d 185 [addressing issues of causation in which the defendant's high-speed chase with peace officers ended in injury to one officer and death of a third-party motcirist].) Such a narrow "`interpretation effectively limiting a victim's rights to restitution would be in derogation of the expressed intent and purposes of Proposition 8 and the provisions adopted by the Legislature to implement this measure.' [Citation.]" (People v. Carbajal (1995) 10 Cal.4th 1114, 1122, 43 Cal.Rptr.2d 681, 899 P.2d 67, quoting People v. Baumann (1985) 176 Cal.App.3d 67, 83, 222 Cal.Rptr. 32.)[5]
"The intent of the voters is plain: every victim who suffers a loss shall have the right to restitution from those convicted of the crime giving rise to that loss." (People v. Phelps, supra, 41 Cal.App.4th at p. 950, 48 Cal.Rptr.2d 855; see also People v. Mearns (2002) 97 Cal.App.4th 493, 500-501, 118 Cal.Rptr.2d 511.) We conclude that the Jem employees who lost wages as a result of defendant's scheme were direct victims of her crimes and were therefore entitled to restitution under section 1202.4. Accordingly, the court did not err in ordering defendant to pay Jem's employees restitution in the amount of $170,604.66.

III. The Property Damage Enhancement

Defendant contends that the four-year prison term to which she was sentenced pursuant to section 12022.6, subdivision (a)(4) must be stricken.[6] The property damage enhancement was based upon the premise that the lost profits Wendy's sustained as a result of the hoax constituted *241 "property" under section 12022.6. Because (defendant argues) her conduct did not involve the taking, damaging or destruction of "property," as that term was intended under the statute, the imposition of the sentence enhancement was unlawful.
The Attorney General raises a threshold issue. He argues that defendant is barred from challenging the imposition of the property damage enhancement because of the absence of a certificate of probable cause under section 1237.5. We address this threshold matterone to which defendant in her reply brief does not respond below.
Generally speaking, under section 1237.5,[7] a defendant may not bring an appeal from a judgment of conviction entered after a guilty or no contest plea, including an appeal challenging the validity of the plea, unless he or she has first obtained from the superior court a certificate of probable cause. (People v. Mendez (1999) 19 Cal.4th 1084, 1095, 81 Cal. Rptr.2d 301, 969 P.2d 146.) As the Supreme Court has held, however: "Notwithstanding the broad language of section 1237.5, it is settled that two types of issues may be raised in a guilty or nolo contendere plea appeal without issuance of a certificate: (1) search and seizure issues for which an appeal is provided under section 1538.5, subdivision (m); and (2) issues regarding proceedings held subsequent to the plea for the purpose of determining the degree of the crime and the penalty to be imposed. [Citations.]" (People v. Panizzon (1996) 13 Cal.4th 68, 74-75, 51 Cal. Rptr.2d 851, 913 P.2d 1061 (Panizzon); see also Cal. Rules of Court, rule 8.304(b).)[8]
Our high court advises that the certificate requirements of section 1237.5 "should be applied in a strict manner." (People v. Mendez, supra, 19 Cal.4th at p. 1098, 81 Cal.Rptr.2d 301, 969 P.2d 146.) And the court has strongly criticized the practice in some appellate decisions of reaching the merits of the appeal, notwithstanding the defendant's noncompliance with section 1237.5's certificate requirements. (People v. Mendez, supra, at pp. 1097-1098, 81 Cal.Rptr.2d 301, 969 P.2d 146 [rejecting appellate courts' approach of granting "dispensation" to defendant not in compliance with section 1237.5 under rationale that defendant may seek same relief by habeas corpus petition]; Panizzon, supra, 13 Cal.4th at p. 89, fn. 15, 51 Cal.Rptr.2d 851, 913 P.2d 1061 ["the purposes behind section 1237.5 will remain vital only if appellate courts insist on compliance with its procedures"].) As noted in People v. Cole (2001) 88 Cal.App.4th 850, 860, footnote 3, 106 Cal.Rptr.2d 174, "strict application of section 1237.5 works no undue hardship on defendants with potentially meritorious appeals. The showing required to obtain a certificate is not stringent. Rather, the test applied by the trial court is simply `whether the appeal is *242 clearly frivolous and vexatious or whether it involves an honest difference of opinion.' [Citation.]"
In assessing whether an appeal that purports to challenge a post-guilty plea sentence requires a certificate of probable cause, courts examine the substance of the appeal: "[T]he crucial issue is what the defendant is challenging, not the time or manner in which the challenge is made." (People v. Ribero (1971) 4 Cal.3d 55, 63, 92 Cal.Rptr. 692, 480 P.2d 308.) Thus, for instance, in Panizzon, supra, 13 Cal.4th at pages 73 and 74, 51 Cal.Rptr.2d 851, 913 P.2d 1061, the defendantafter having pleaded no contest as part of a plea agreement to a sentence of life with the possibility of parole plus 12 yearsappealed, claiming that the agreed-upon sentence was disproportionate to the sentence his codefendant received and was thus unconstitutional. The court pierced the surface of the defendant's challenge. While the appeal on its face did not attack the validity of the plea, the court nonetheless held that the defendant was required to obtain a probable cause certificate because the "challenge to a negotiated sentence imposed as part of the plea bargain is properly viewed as a challenge to the validity of the plea itself." (Id. at p. 79, 51 Cal.Rptr.2d 851, 913 P.2d 1061; see also id. at p. 89, 51 Cal.Rptr.2d 851, 913 P.2d 1061 [defendant effectively sought "to challenge the very sentence he negotiated as part of the plea"]; People v. Shelton (2006) 37 Cal.4th 759, 766, 37 Cal.Rptr.3d 354, 125 P.3d 290 [same].)
In People v. Arwood (1985) 165 Cal. App.3d 167, 211 Cal.Rptr. 307, this court addressed whether a defendant's challenge to the imposition of a sentencing enhancement following his conviction through a plea was defective because of his failure to obtain a certificate of probable cause under section 1237.5. There, the defendant pleaded nolo contendere to a charge of forcible rape and admitted an enhancement (prior conviction of assault with a deadly weapon with personal use of the deadly weapon). (Id. at p. 170, 211 Cal. Rptr. 307.) We held that the defendant's appeal was defective under section 1237.5 because of the absence of a probable cause certificate: "[The defendant] argues the admitted felony is not a serious felony within the meaning of section 667. He therefore challenges the propriety of imposing section 667's enhancement upon him by virtue of his admission. This constitutes a challenge to the validity of his plea insofar as it encompassed admission of a prior serious felony within the meaning of section 667. [The defendant's] characterization of this challenge as one merely touching upon his sentencing does not change its substance and avoid the requirements of section 1237.5." (Id. at p. 172, 211 Cal.Rptr. 307; see also People v. Breckenridge (1992) 5 Cal.App.4th 1096, 8 Cal.Rptr.2d 1, disapproved on another ground in In re Chavez (2003) 30 Cal.4th 643, 657, fn. 6, 134 Cal.Rptr.2d 54, 68 P.3d 347 [probable cause certificate required where the defendant's challenge to enhancement was that he had been inadequately advised followed his guilty plea and admission of prior serious felony conviction].)
In People v. Jones (1995) 33 Cal.App.4th 1087, 1088-1089, 39 Cal.Rptr.2d 530, the defendantwho pleaded no contest to several charges, including burglary and two counts of possession of stolen property challenged the validity of her conviction of both burglary and possession of stolen property obtained during the burglary. This court's majority, following Arwood, held that the defendant's appeal constituted a challenge to the validity of her plea, thereby triggering the requirements of obtaining a probable cause certificate under *243 section 1237.5. (Jones, supra, at pp. 1093-1094, 39 Cal.Rptr.2d 530.)[9]
In this instance, defendant contends that the four-year sentence enhancement imposed under section 12022.6, subdivision (a)(4) was unlawful. She argues that the enhancement did not apply to her circumstances because she did not "take[], damage[], or destroy[] any property in the commission or attempted commission of a felony" with a value exceeding $2,500,000.00 under section 12022.6, subdivision (a)(4). But this challenge while couched in terms of an attack on the sentence entered after defendant's guilty pleais in substance a dispute concerning the factual basis underlying her admission of the special allegation. "A guilty plea admits every element of the charged offense and constitutes a conviction [citations], and consequently issues that concern the determination of guilt or innocence are not cognizable [on appeal. Citations.]." (In re Chavez, supra, 30 Cal.4th at p. 649, 134 Cal.Rptr.2d 54, 68 P.3d 347.) And the prior admission of an enhancement is the same as a plea of guilty to a charged offense. (People v. Blackburn, supra, 72 Cal.App.4th at p. 1530, 86 Cal.Rptr.2d 134; People v. Shirley (1993) 18 Cal.App.4th 40, 46, 22 Cal. Rptr.2d 340.) Indeed, the assistant district attorney and defendant's counsel here stipulated that there was a factual basis for the guilty pleas and enhancement admissions, and the court made a finding of the existence of such a factual basis. We therefore conclude that defendant's challenge to the four-year enhancement following her guilty plea and admission of the enhancement "is properly viewed as a challenge to the validity of the plea itself." (Panizzon, supra, 13 Cal.4th at p. 79, 51 Cal.Rptr.2d 851, 913 P.2d 1061.) Since defendant failed to obtain a certificate of probable cause in compliance with section 1237.5, her challenge to the imposition of the enhancement *244 under section 12022.6, subdivision (a)(4) is barred. (Jones, supra, 33 Cal. App.4th at pp. 1093-1094, 39 Cal.Rptr.2d 530.)

IV. Upper Term Sentence

A. Background and Contentions of the Parties

The court imposed an upper term sentence of five years for the count 1 conviction (§ 550, subd. (a)(1)). The court based its sentence on the following two factors in aggravation enunciated in the California Rules of Court, rules 4.421(a)(1) and 4.421(a)(8), respectively: "[T]he crime did involve other acts disclosing] ... a high degree of callousness .... [¶] ... [and] the manner in which the crime was carried out, indicates planning and sophistication."[10]
Defendant claims that under Blakely, supra, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, she was deprived of her constitutional right to a jury trial when the trial court imposed an upper term sentence for the count 1 conviction. She asserts that because the court found by a preponderance of the evidence the existence of two aggravating factors warranting imposition of the upper term, she was deprived of her constitutional right to a jury trial and application of proof beyond a reasonable doubt. In her reply brief,[11] defendant argues that the upper term sentence must be reversed under Cunningham, supra, 549 U.S.___, 127 S.Ct. 856.
The Attorney General makes three arguments in response to defendant's Blakely challenge. He argues that defendant forfeited the challenge by failing to assert it below. Second, any Blakely challenge is substantively without merit. Third, assuming any error, it was harmless beyond a reasonable doubt.

B. Discussion of Blakely Challenge

1. Forfeiture

As we discuss, post, the holding of the California Supreme Court in People v. Black (2005) 35 Cal.4th 1238, 29 Cal. Rptr.3d 740, 113 P.3d 534 (Black I), until Cunningham was decided very recently on January 22 of this yearcompelled the conclusion that a criminal defendant's constitutional rights are not abridged when a court sentences him or her to the upper term under California's determinate sentencing law (hereafter sometimes referred to as DSL). Our Supreme Court decided Black I on June 20, 2005, nearly seven months before defendant's sentencing hearing. At that time, the trial court was required to follow Black I. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) Therefore, it would have been futile for defense counsel here to have objected under Blakely to the trial court's imposition of an upper term sentence. Under these circumstances, defendant's Blakely challenge was not forfeited. (People v. Birks (1998) 19 Cal.4th 108, 116, fn. 6, 77 *245 Cal.Rptr.2d 848, 960 P.2d 1073; People v. Turner (1990) 50 Cal.3d 668, 703-704, 268 Cal.Rptr. 706, 789 P.2d 887.)
Any doubt concerning the possible forfeiture of defendant's Blakely challenge was laid to rest by our Supreme Court recently in People v. Sandoval (2007) 41 Cal.4th 825, 62 Cal.Rptr.3d 588, 161 P.3d 1146 (Sandoval). In Sandoval, the Attorney General made the identical argument that the defendant's Blakely challenge was forfeited because of his failure to raise it at a sentencing hearing that took place after Black I was decided but before Cunningham was decided by the United States Supreme Court. Our high court concluded that it would have been futile for the defendant to have asserted a Blakely challenge at the trial level because the sentencing court was bound to follow Black I. (Sandoval, supra, at p. 837, fn. 4, 62 Cal. Rptr.3d 588,161 P.3d 1146.)
We therefore reject the Attorney General's forfeiture argument and proceed with the merits of defendant's Blakely challenge.

2. Merits of Blakely challenge

In Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Apprendi), the United States Supreme Court held unconstitutional a law that permitted an enhancement that could have resulted in potentially double the maximum sentence for possession of a firearm in the event that the judge determined by a preponderance of the evidence that a hate crime had been committed. It concluded that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Id. at p. 490, 120 S.Ct. 2348.) This principle, the court explained, derives from two constitutional rights, namely, the right to trial by jury, and the prohibition against depriving a person of liberty without due process of law. (Id. at pp. 476-477, 120 S.Ct. 2348; see also Ring v. Arizona (2002) 536 U.S. 584, 603-609, 122 S.Ct. 2428, 153 L.Ed.2d 556.)
In Blakely, supra, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, the Supreme Court considered Washington determinate sentencing laws under which the trial court had determined that the defendant "had acted with `deliberate cruelty'" (id. at p. 298, 124 S.Ct. 2531), and accordingly had "imposed an exceptional sentence of 90 months37 months beyond the standard maximum." (Id. at p. 300, 124 S.Ct. 2531.) The Supreme Court concluded that the statute was unconstitutional: "[T]he `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. [Citations.] In other words, the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (Id. at pp. 303-304, 124 S.Ct. 2531.) The judge had relied on a fact not. found by the jury or admitted by the defendant; accordingly the Supreme Court concluded that the sentence in Blakely was invalid. (Id. at p. 304, 124 S.Ct. 2531; see also United States v. Booker (2005) 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (Booker) [Blakely holding found applicable to Federal Sentencing Guidelines].)
In Black I, supra, 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534, the California Supreme Court considered the effect of Blakely and Booker on upper term sentencing under California's determinate sentencing law. The trial court had imposed an upper term sentence of 16 years, based upon "`the nature, seriousness, and *246 circumstances of the crime.'" (Black I, supra, at p. 1245, 29 Cal.Rptr.3d 740, 113 P.3d 534.) The Supreme Court, rejecting the defendant's Blakely challenge, held that the imposition of an upper term sentence under California's DSL was not unconstitutional, reasoning that "the upper term is the `statutory maximum' for purposes of Sixth Amendment analysis. The jury's verdict of guilty on an offense authorizes the judge to sentence a defendant to any of the three terms specified by statute as the potential punishments for that offense, as long as the judge exercises his or her discretion in a reasonable manner that is consistent with the requirements and guidelines contained in statutes and court rules." (Black I, supra, at pp. 1257-1258, 29 Cal.Rptr.3d 740, 113 P.3d 534.)
The defendant hi Cunningham, supra, 549 U.S.___, 127 S.Ct. 856, received an upper term sentence of 16 years under California's DSL, the sentencing judge having found six aggravating factors warranting the sentence. (Cunningham, supra, at pp. ___-___, 127 S.Ct. at pp. 860-861.) The appellate court rejected the defendant's Blakely challenge, and the California Supreme Court denied review, having decided Black I nine days earlier. (Cunningham, supra, at p.___, 127 S.Ct. at p. 861.) Justice Ginsburg, writing for the majority, noted: "This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." (Cunningham, supra, at pp. ___-___, 127 S.Ct. at pp. 863-864.) Accordingly, the courtoverruling Black Iconcluded that "aggravating circumstances depend on facts found discretely and solely by the judge. In accord with Blakely, therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. [Citation.] Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, [citation], the DSL violates Apprendi's bright-line rule: Except for a prior conviction, `any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.]" (Cunningham, supra, at p.___, ___ U.S. at p. ___, 127 S.Ct. at p. 868.) The Cunningham court thus concluded that the California Supreme Court's reasoning in Black I was at odds with the principles of Apprendi and Blakely: "Because the DSL allocates to judges sole authority to find facts permitting the imposition of an upper term sentence, the system violates the Sixth Amendment." (Cunningham, supra, at p. ___, 127 S.Ct. at p. 870.)
In People v. Black (2007) 41 Cal.4th 799, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (Black II), the court recently reexamined the propriety of the defendant's upper term sentence in light of Cunningham. The court acknowledged Cunningham's disagreement with Black I's holding that California's DSL did not violate the Sixth Amendment insofar as it permitted the sentencing judge to impose an upper term sentence based upon factors not determined by a jury beyond a reasonable doubt. (Black II, supra, at p. 808, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) But the court in Black II concluded that "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the *247 appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (Black II, supra, at p. 813, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) It therefore held "that imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (Id. at p. 816, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) Because the judge based the upper term sentence upon a factor (i.e., force used to commit sex crime) that was the basis for the jury's prior true finding on a special allegation, the court in Black II held that the upper term sentence was not unconstitutional. (Id. at pp. 816-817, 62 Cal. Rptr.3d 569,161 P.3d 1130.)
There is merit to defendant's challenge here, based upon Cunningham and notwithstanding the holding in Black II. The sentencing provision with which we are concerned specifies that the crime of presenting a false or fraudulent insurance claim is "punishable by imprisonment in the state prison for two, three, or five years." (§ 550, subd. (c)(1).) Thus, under Cunningham, the middle term of three years was the "statutory maximum" for Sixth Amendment purposes under Blakely. (Cunningham, supra, 549 U.S. ___, 127 S.Ct. at p. 868.) And, the basis upon which the trial court imposed the upper term here did not include at least "one legally sufficient aggravating circumstance ... found to exist by the jury, ... admitted by the defendant, or ... justified based upon the defendant's record of prior convictions." (Black II, supra, 41 Cal.4th at p. 816, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) Thus, the aggravating factors relied on by the trial courti.e., the crime involved "a high degree of ... callousness.... [¶] ... [and] the manner in which the crime was carried out, indicate[d] planning and sophistication"were not ones for which an upper term sentence could be constitutionally imposed. (See Sandoval, supra, 41 Cal.4th at pp. 837-838, 62 Cal. Rptr.3d 588, 161 P.3d 1146 [Blakely error occurred where upper term sentence was based upon trial judge's findings, not admitted by the defendant or found by a jury, that crime involved great violence and extremely callous behavior, that there was planning and premeditation, and that victims were very vulnerable].) We therefore conclude that the court erred by imposing the upper term of five years as provided in section 550, subdivision (c)(1) for the crime of presenting a false or fraudulent insurance claim.

3. Prejudice

The Attorney General argues lastly that, assuming there was Blakely error, it was harmless because defendant cannot establish prejudice. The Attorney General, citing Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, contends that "given that the facts underlying [defendant's] offense clearly indicated planning and the unquestionably callous nature of the offense, any error was harmless beyond a reasonable doubt." He argues further that through her guilty plea, defendant impliedly admitted that her actions were callous and that the crime was carried out with planning and sophistication.
Our high court has recently confirmed that the deprivation of the right to a jury trial on the issue of aggravating circumstances for sentencing is reviewed under a Chapman harmless error standard. (Sandoval, supra, 41 Cal.4th at p. 838, 62 Cal.Rptr.3d 588, 161 P.3d 1146; *248 see also Washington v. Recuenco (2006) 548 U.S. ___, 126 S.Ct. 2546, 165 L.Ed.2d 466 [Blakely sentencing error is not structural error mandating reversal without consideration of whether error is harmless].) Under this analysis, "we must determine whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (Sandoval, supra, at p. 838, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) Thus, "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (Id. at p. 839, 62 Cal.Rptr.3d 588, 161 P.3d 1146.)
In Sandoval, supra, 41 Cal.4th at p. 837, 62 Cal.Rptr.3d 588, 161 P.3d 1146, the aggravating factors relied upon by the trial court were that the crime "`involve[ed] a great amount of violence. This was also incredibly callous behavior.... The victims were particularly vulnerable.... [The defendant's] actions showed planning, premeditation...."' The Supreme Court examined the record to determine whether it, as the reviewing court, could conclude that a jury would have found true beyond a reasonable doubt one or more of the aggravating circumstances found by the trial court. (Id. at pp. 838-843, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) While the court acknowledged that there was significant evidence supporting the aggravating factors, it held that the Sixth Amendment error was not harmless beyond a reasonable doubt under the above-enunciated standard. (Id. at p. 843, 62 Cal.Rptr.3d 588, 161 P.3d 1146.)
We similarly conclude that the Sixth Amendment error here was not harmless. In contrast to Sandoval, where there was an extensive record from a jury trial, here the only record was a one and one-half page summary of the offenses (counts 1 and 2) in the probation report. As the court noted in Sandoval, "the reviewing court cannot necessarily assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury. Although the aggravating circumstances found by the trial court were based upon the evidence presented at trial, they were not part of the charge and were not directly at issue in the trial. Aggravating circumstances are based upon facts that are not elements of the crime. [Citation. The defendant thus did not necessarily have reasonor the opportunity during trial to challenge the evidence supporting these aggravating circumstances unless such a challenge also would have tended to undermine proof of an element of an alleged offense." (Sandoval, supra, 41 Cal.4th at p. 839, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) That observation holds even greater meaning here where there was no trial and the only record available in our harmless-error analysis is a summary prepared by a probation officer in contemplation of a sentencing hearing.
The Blakely error here was not harmless beyond a reasonable doubt. The matter must be remanded to the trial court for resentencing.

DISPOSITION
The judgment is reversed and remanded to the trial court for the limited purpose of resentencing consistently with this opinion, Blakely, supra, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, Cunningham, supra, 549 U.S. ___, 127 S.Ct. 856, Black II, supra, 41 Cal.4th 799, 62 Cal.Rptr.3d 569, *249 161 P.3d 1130, and Sandoval, supra, 41 Cal.4th at 838, 62 Cal.Rptr.3d 588, 161 P.3d 1146.
WE CONCUR: BAMATTRE-MANOUKIAN, Acting P.J., and McADAMS, J.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise stated.
[2] Defendant's husband, Plascencia, was also charged in the complaint as to counts 1 and 2. After pleading guilty to presenting a false or fraudulent insurance claim (§ 550, subd. (a)(1)), and to attempted grand theft of personal property over $400 (§§ 664/487, subd. (a)), Plascencia filed a separate appeal with this court. We affirmed the judgment in an unpublished opinion of which we take judicial notice pursuant to Evidence Code sections 452, subdivision (d) and 459, subdivision (a). (See People v. Plascencia (Nov. 28, 2006, H029862, 2006 WL 3412442 [nonpub. opn.], review granted Feb. 7, 2007, S149251.)
[3] "For purposes of this section, `victim' shall include all of the following: [¶] (1) The immediate surviving family of the actual victim. [¶] (2) Any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime. [¶] (3) Any person who has sustained economic loss as the result of a crime and who satisfies any of the following conditions: [¶] (A) At the time of the crime was the parent, grandparent, sibling, spouse, child, or grandchild of the victim. [¶] (B) At the time of the crime was living in the household of the victim. [¶] (C) At the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A). [¶] (D) Is another family member of the victim, including, but not limited to, the victim's fiance or fiancee, and who witnessed the crime. ¶] (E) Is the primary caretaker of a minor victim. [¶] (4) Any person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code." (§ 1202.4, subd. (k).) We quote from the current version of section 1202.4, subdivision (k), as last amended substantively in 2004 (see Stats., ch. 223, § 2, pp. 1949-1953). In so doing, we disagree with the Attorney General's contention that section 1202.4, subdivision (k) as it existed before the 2004 amendment, is the applicable version. The 2004 amendment became effective immediately upon passage of the legislation, on August 16, 2004 (see Stats., ch. 223 (S.B.631), p. 1947), months before the instant crimes (counts 1 and 2) were alleged in the complaint to have occurred. (See Birkett, supra, 21 Cal.4th at p. 247, fn. 21, 87 Cal.Rptr.2d 205, 980 P.2d 912 [restitution law in effect when crime occurred is applicable statute].)
[4] Although Birkett involved a victim restitution order to a probationer under former section 1203.04, while we are concerned here with a restitution order imposed in conjunction with a nonprobationary sentence under section 1202.4, this distinction is immaterial to our discussion here. (See People v. Hove (1999) 76 Cal.App.4th 1266, 1271-1272, 91 Cal.Rptr.2d 128.)
[5] Defendant also cites People v. Martinez (2005) 36 Cal.4th 384, 30 Cal.Rptr.3d 779, 115 P.3d 62, in support of his contention. There, the court reiterated its holding that former section 1203.04, "permitt[ed] restitution to entities that are `direct' victims of crime [only in instances in which] the `entities [are those] against which the probationer's crimes had been committed'that is, entities that are the `immediate objects of the probationer's offenses.' [Citation.]" (Martinez, supra, at p. 393, 30 Cal.Rptr.3d 779, 115 P.3d 62, quoting Birkett, supra, 21 Cal.4th at pp. 232-233, 87 Cal.Rptr.2d 205, 980 P.2d 912.) In Martinez, the court reversed a restitution order reimbursing the Department of Toxic Substances Control for cleanup costs associated with the defendant's operation of a methamphetamine lab, concluding that the offense was not committed against the Department. (Martinez, supra, at p. 393, 30 Cal.Rptr.3d 779, 115 P.3d 62.) Martinez, like Birkett, involved circumstances very different from this case; it does not support defendant's claim that the restitution order as to the Jem employees was unlawful.
[6] "When any person takes, damages, or destroys any-property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] ... [¶] (4) If the loss exceeds two million five hundred thousand dollars ($2,500,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of four years." (§ 12022.6, subd. (a).)
[7] "No appeal shall be taken by the defendant from a judgment of conviction upon a plea of guilty or nolo contendere, ... except where both of the following are met: [¶] (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings. [¶] (b) The trial court has executed and filed a certificate of probable cause for such appeal with the clerk of the court." (§ 1237.5.)
[8] California Rules of Court, rule 8.304(b)(4) (formerly rule 30(b)(4)), provides that a defendant appealing from a superior court judgment following the entry of a plea of guilty or no contest need not comply with the certificate of probable cause requirements of section 1237.5 "... if the notice of appeal states that the appeal is based on: [¶] (A) the denial of a motion to suppress evidence under Penal Code section 1538.5, or [¶] (B) Grounds that arose after entry of the plea and do not affect the plea's validity."
[9] In so concluding, this court acknowledged (Jones, supra, 33 Cal.App.4th at p. 1093, 39 Cal.Rptr.2d 530) a contrary view expressed by the First District Court of Appeal in two cases. In People v. Loera (1984) 159 Cal. App.3d 992, 996, 206 Cal.Rptr. 60, the defendant in Loera pursuant to a plea agreement pleaded guilty to receiving stolen property and admitted that the value of the property exceeded $25,000. He then challenged the imposition of a one-year enhancement, arguing that section 12022.6, subdivision (a) could not be used to enhance a sentence based upon a conviction for receiving stolen property. (Loera, supra, at p. 997, 206 Cal.Rptr. 60.) The appellate court held that the defendant was not required to obtain a certificate of probable cause, concluding that the defendant was challenging the sentence as being void; it was thus "a jurisdictional defect subject to correction whenever it comes to the attention of either a trial court or a reviewing court. [Citations.]" (Id. at p. 998, 206 Cal.Rptr. 60.) Last year, the First District Court of Appeal considered whether a probable cause certificate was required where the defendant argued on appeal that the imposition of a great bodily injury enhancement, the allegations of which she admitted in her plea, was unlawful because it was inapplicable to circumstances where child endangerment resulted in death. (People v. Corban (2006) 138 Cal.App.4th 1111, 42 Cal.Rptr.3d 184.) Following Loera and concluding that no probable cause certificate was required, the court distinguished Arwood and Breckenridge on the basis that Loera (as well as Corban ) "addressed purely legal arguments about the applicability of an enhancement having nothing to do with the particular facts of the defendant's case." (Corban, supra, at p. 1116, 42 Cal.Rptr.3d 184.) For the reasons we expressed in Jones, supra, 33 Cal.App.4th at page 1093, 39 Cal. Rptr.2d 530, we conclude that Loera is inconsistent with Anvood and Breckenridge, and we choose to follow those cases and Jones. To the extent that Corban offers a distinction between Loera and the cases we have decided, we note that here defendant's challenge to the property damage enhancement under section 12022.6 is not purely a legal argument resolvable without reference to the particular facts presented.
[10] "Circumstances in aggravation include facts relating to the crime and factors relating to the defendant. [¶] ... [¶]] Factors relating to the crime, whether or not charged or chargeable as enhancements, include that: [¶] (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; [¶] ... [¶] (8) The manner in which the crime was carried out indicates planning, sophistication, or professionalism;..." (Cal. Rules of Court, rule 4.421(a).)
[11] In her opening brief, defendant noted that this court was bound by California Supreme Court precedent but that she was arguing the matter to preserve it for federal review. Cunningham v. California, supra, 549 U.S. ___, 127 S.Ct. 856, was decided approximately one month after defendant filed her opening brief.