Filed 10/30/14  P. v. McGill CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ERIC MCGILL,<br><br>    Defendant and Appellant.</td><td>E058966<br><br>(Super.Ct.No. FVI1102035)<br><br>OPINION</td></tr>
</table>

APPEAL from the Superior Court of San Bernardino County.  Eric M. Nakata, Judge.  Affirmed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Richard Eric McGill of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1], a lesser included offense of the charged crime of first degree murder (count 1; § 187, subd. (a)). The court imposed the aggravated prison term of 11 years. On appeal, defendant contends the court abused its discretion in imposing the upper term. We affirm.

FACTS AND PROCEDURAL HISTORY

On August 11, 2011, Deputy Sheriff Andy Antekeier received a report that defendant and the victim, defendant's girlfriend with whom he lived, were missing. Antekeier responded to defendant and the victim's address in Lucerne Valley and was informed by the new tenant they had moved out. Antekeier found the trailer in which defendant and the victim lived parked adjacent to Elvia Mondragon's residence. Mondragon said she had seen them move the trailer, but had not seen them for a few days.

Later that evening, Antekeier received a telephone call from Mondragon informing him that defendant had returned. Antekeier spoke with defendant, who informed him that defendant and the victim had been in Big Bear. Defendant said the victim had remained there. Anetekeier asked defendant to have the victim call him. He never heard from defendant thereafter.

On August 13, 2011, officers responded to a rural desert area where an individual riding an off-road vehicle reported finding human remains. The body was only partially

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

covered. Fingerprints were used to identify the body as that of the victim. Detective David Johnson searched the trailer in which defendant and the victim lived. Only female clothing could be found within the trailer. The victim's purse contained methamphetamine.

Johnson found blood stains and blood spatter on the outside of the trailer near its entrance. Possible bloodstains were found in the living room and kitchen underneath the carpeting, on an area rug, and on a wall. Blood was found on objects in defendant's truck. Johnson later searched the area around where the trailer had previously been located. Johnson found "[s]ome possible bloodstains, a white towel inside a trash can which was attempted to have been burned or was partially burned. There were two fired cartridge casings and some other cleaning supplies in the trash." An arrest warrant was issued for defendant's arrest.

Video surveillance showed the victim's EBT card had been used by defendant on the morning of August 11, 2011, to make a purchase at a grocery store in Apple Valley. Defendant was arrested in Jackson County, Kansas on August 30, 2011. Johnson flew to Kansas to transport defendant back to San Bernardino.

During both his interrogation and his testimony at trial, defendant reported that the victim was a methamphetamine addict who was fine while she was on the drug, but turned violent when no longer high. In the past, she had run him out of his own home, threatened him, threw things at him, stabbed him multiple times, knocked his teeth out, set him on fire, and run him over with a car twice. The victim threatened to kill defendant more than once.

3

At some point, defendant and the victim were compelled by code enforcement to move their trailer off the property on which it rested. This caused the victim to be under even more stress than usual. On August 9, 2011, while defendant was in the trailer resting on the couch, the victim came home in a tirade about having to move. She jumped on defendant and swung a hammer at him. He attempted to block her blows and kicked her off of him. The victim fell backwards out the door of the trailer onto a bucket of tools containing pry-bars, crowbars, hammers, pipes, and axes. She was bleeding from the back of her head. Defendant brought her inside the trailer where he attempted to stop the bleeding with a dish rag. The victim died in his arms.

Defendant insisted the victim's death was an accident; he did not intend to hurt or kill her. Defendant panicked out of fear and shock. He placed the victim's body in his truck, drove out to the desert, and buried her body. He cleaned the blood off the trailer with water. He then moved the trailer with a tractor. Defendant left California in a car registered to the victim. He stole Idaho license plates off a car and placed them on the victim's vehicle because he suspected law enforcement would be looking for it. Defendant brought with him the bucket of bloody tools on which the victim had landed. He threw the bucket in the Missouri River.

The Deputy Medical Examiner, who performed the autopsy on the victim's body, testified the victim had sustained a fracture of the left ulna (forearm), which was caused by a severe impact unlikely to be caused by a fall. "[I]t's more likely that something struck the body than the body struck something else. So I believe something hit the body rather than there was a fall to explain that." He testified the fracture was "consistent with

4

a defensive injury." "Multiple blows with a hard object could do it. . . . [M]ultiple blows with something like a hammer."

The Medical Examiner also testified the extensive fracturing of the victim's skull was likely caused by a "heavy, hard object [that struck] the head multiple times" resulting in the victim's death. "A fall of, you know, six or seven feet could not cause those injuries." The victim's body testified presumptively positive for methamphetamine and amphetamine.

A neighbor testified both defendant and the victim used methamphetamine. The victim "would always be violent." The victim was "[g]rouchy and mean" while defendant was "calm, mellow." The neighbor said the victim would yell, scream, and throw things at defendant. About a month prior to the victim's disappearance, defendant said of the victim, "'She's driving me crazy. I'm going to end up killing her.'" Another neighbor testified that approximately a month before the victim disappeared, defendant said of the victim, "I'm gonna . . . have to kill her." "He seemed pretty serious."

Several character witnesses and a clinical psychologist testified defendant was not a violent person. Another witness testified the victim used methamphetamine and was often physically and emotionally abusive toward defendant.

DISCUSSION

Defendant contends the court abused its discretion in imposing the aggravated term of incarceration. We disagree.

The trial court indicated it had read the probation officer's report and two victim impact letters. The probation officer's report reflected defendant's criminal record

5

included convictions for fighting, burglary, cultivation of marijuana, driving without a driver's license, possession of illegal fireworks, possession of a controlled substance, possession of marijuana, and obstruction of justice. Defendant had two convictions for driving under the influence. Probation granted after one conviction had later been revoked. Defendant's previous convictions spanned from 1988 to 2011. The probation officer listed in his report as aggravating factors that the instant crime involved great violence and great bodily harm, defendant engaged in violent conduct indicating he was a serious danger to society, and that defendant's prior convictions as an adult were numerous and of increasing seriousness. He listed no mitigating factors. The probation officer recommended imposition of the aggravated term.

At the sentencing hearing, defense counsel argued three mitigating factors: (1) defendant's prior criminal record was insignificant and nonviolent; (2) the victim was the initiator of the violence; and (3) the crime was committed because of an unusual circumstance, such as great provocation, that was unlikely to recur. The court agreed with the probation officer that the fact that the crime involved great violence and great bodily harm constituted an aggravating factor. The court further noted, "And factors relating to the defendant: he was engaged in violent conduct, which indicates a serious danger to society. Defendant's prior convictions are numerous and increase in seriousness. I don't agree with defense counsel that there are those mitigating factors. I will find that there are no mitigating factors." The court imposed the upper term of imprisonment.

"Within the limits set forth by the Legislature, a trial court has broad discretion . . . whether to select the upper, middle, or lower term of imprisonment (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(b))." (*People v. Clancey* (2013) 56 Cal.4th 562, 579.) "In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b).) The sentencing court's decision is subject to review for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

"[A] trial court will abuse its discretion . . . if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. [Citations.]" (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.) Defendants bear a heavy burden when attempting to show an abuse of discretion. (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) "'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.) "'[A]

7

trial court may 'minimize or even entirely disregard mitigating factors without stating its reasons.' [Citation.]" (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258.)

Here, the court's restatement of the aggravating factors listed in the probation officer's report as the basis for imposing the upper term of imprisonment was within the court's discretion. Likewise, the court's disagreement with defense counsel's enumeration of purported mitigating factors was within the court's discretion. Thus, the court acted within its discretion in imposing the aggravated term.

Defendant contends the first two aggravating factors are duplicative and that defendant's criminal record was not of increasing seriousness and is actually a mitigating factor. Defendant additionally notes that the jury's finding necessarily includes the mitigating factor that the victim was the aggressor; thus, the court erred as a matter of law in finding no mitigating factors. Regardless of whether the first two enumerated aggravating factors were duplicative, only one legally sufficient aggravating factor is necessary to justify imposition of the upper term. (*People v. Black* (2007) 41 Cal.4th 799, 813.) Thus, even if considered redundant, the factor, in and of itself, was a legally sufficient basis for the court to impose the upper term.

Moreover, while we might not necessarily interpret defendant's record of criminal convictions as increasing in seriousness, excluding the instant case, it is certainly numerous. Nevertheless, it was within the court's discretion to categorize defendant's criminal record as increasing in seriousness. In no manner can we discern how defendant's lengthy criminal record could be deemed a mitigating factor. Finally, although the jury's decision to convict on the lesser offense may have included an

inherent finding that the victim was the aggressor, it was within the court's discretion to minimize or entirely disregard this purported mitigating factor. (*People v. Lai*, *supra*, 138 Cal.App.4th at p. 1258.) Thus, the court specified legally sufficient reasons for imposing the aggravated term of imprisonment.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:

<u>RAMIREZ</u>
P. J.

<u>McKINSTER</u>
J.

9